THE CUMBERLAND BANK v. RICHARD HANN.

In Case. Question as to priority of Executions.

1. A Sheriff after having levied on goods and chattels, is presumed in law to have the possession or custody of them, and he must take care of them at his peril.

2. He may leave them in the actual possession of the defendant until the day of sale, and in such case, the law will consider the defendant as his agent or bailiff: but it will be at the risk of the sheriff as between him and the plaintiff, in case the goods are wasted, lost or destroyed.

3. Goods so left by the sheriff, acting in good faith, would not be liable to seizure on a subsequent execution, so as to avoid the first levy.

4. The sheriff may so leave the goods by the direction or consent of the plaintiff and at the plaintiff's risk, as to waste, loss or destruction, without thereby losing his legal custody of them, or the plaintiff's priority, if done in good faith.

5. The plaintiff may wait on the sheriff, as long as the sheriff chooses to

indulge the defendant: or may consent to, or direct, reasonable adjournments, without thereby losing his priority, if done in good faith.

6. The plaintiff, when he delivers his execution to the sheriff, or afterwards, may direct the sheriff not to proceed to a sale, without further orders from him, or unless urged on by younger executions, without thereby losing his priority, if done in good faith.

7. But if defendant is permitted with the knowledge and consent, express or implied, of the plaintiff, not only to use, but to exercise an unlimited control and dominion over all the property levied on, selling, consuming or disposing of it as his own, it is evidence of a fraudulent and colorable use of the execution, so as to let in a younger execution prosecuted in good faith.

8. It is not necessary to prove actual fraud in the concoction of the judgment: nor an actual deliberate intention to defeat, hinder or delay other creditors. A man may lose his rights, as well by negligence and a disregard of the rights of others, as by positive fraud or malfeasance.

This case, involving the question of priority among certain executions, came before the court upon a certificate of the Circuit Court of the county of Cumberland.

Six executions having been levied upon the property of Richard Hann the defendant, the property sold and the proceeds of the sale brought into court, *E. P. Seeley* claimed to have the money raised first applied to the satisfaction of the three oldest executions in the order of their priority in respect to each other ; *R. P. Thompson* insisted that the fourth and fifth executions were entitled to priority and should be first paid : while *L. Q. C. Elmer* contended that all the five prior executions ought to be postponed to the one in favor of the Cumberland Bank, which was the youngest.

The material facts contained in the state of the case agreed upon, will be found in the opinion of the Court, delivered by

HORNBLOWER, C. J. This case was argued before me at the Cumberland Circuit in June last, and after giving it the best consideration I could, in the hurry of that and the immediately succeeding Circuits, I came to the conclusion, that the execution in favor of the Cumberland Bank ought to be first satisfied in full, all the other executions having lost their priority. An order to that effect was accordingly made ; but inasmuch as I knew there was some conflict of opinion at the bar, and at least an apparent discrepancy in the reported decisions of this court, on the subject, I tendered myself willing, at the request of either party,

to send the case here by certificate for the opinion of this court. That offer having been embraced, I am happy in the opportunity, with the aid and advice of my associates, of reviewing that decision and correcting the error, if any has been committed.

It is not questioned, I believe on the bench, nor I presume at the bar, but that the decision of the Circuit Court, was in strict accordance with the rules of the common law and the decisions of England, as they stood at the time of our revolution. Although I am not entirely satisfied with all that was said in the case of *Sterling* v. *Van Cleve*, 7 *Halst.* 285, yet I feel the duty and necessity of preserving uniformity of decision in this court, so long as it can be done, without a sacrifice of right and conscience. As to so much of the language of the court, in that case, and in the other reported cases, as gives us the history of the doctrine and practice in this state, on the subject of executions, at and prior to the 2d of July, 1776, when our constitution was adopted, it does not become me to question their accuracy. But I must be permitted to say, that in the course of my professional studies, I have been taught to believe, that the common law, in relation to writs of fieri facias, was and always had been the law of this state ; and my uniform practice at the bar, and so far as I understood, that of my cotemporaries, was always in conformity with that rule.

I have now carefully gone over and examined the cases, of *Casher* v. *Peterson*, 1 *South.* 317 ; *Matthews* v. *Warne*, 6 *Halst.* 295 ; *Williamson* v. *Johnston*, 7 *Halst.* 86 ; *Sterling* v. *Van Cleve*, *Id.* 285 ; and *Cook* v. *Wood*, 1 *Harr.* 254, which are, I believe, the only reported cases directly in point, in our own court.

Without protracting this opinion, by a recital of the facts in those cases, and by comparing and analysing the decisions of the court, I think the following rules, or propositions may be deduced from them, or at least be safely stated, as the law of this state in relation to writs of execution against goods and chattels.

First, If no special directions, different from or contrary to the command of the writ, have been given to the sheriff, he is presumed in law, after having made a levy, to have the possession or custody of the goods levied on. He must take care of them at his peril, and proceed to execute the writ, on pain of amercement if he fails to do so.

Second. The sheriff is not bound to remove the goods; he may leave them in the actual possession of the defendant, until the day of sale; and in such case, the law will consider the defendant, as the sheriff's agent or bailiff, for the safe keeping of the goods; but it will be at the risk of the sheriff, as between him and the plaintiff, in case the goods are wasted, lost or destroyed.

Third. Goods so left by the sheriff, acting in good faith, would not be liable to seizure upon a subsequent execution, so as to avoid the first levy; but might be recovered by the sheriff under the first execution in any proper action.

Fourth. If the sheriff is unwilling to leave the goods in the defendant's possession, at his own risk, he may do so by the direction or consent of the plaintiff, and at the plaintiff's risk as to waste, loss or destruction, without thereby losing his legal custody of them, or the plaintiff's priority, if it is done in good faith. But if they are so left for several years, or an unusual or unreasonable time, and the defendant is permitted to use and enjoy them as before the levy, it may be evidence of a fraudulent intent in law, more or less strong according to the circumstances, and of which the court must judge, whenever the question arises.

Fifth. The plaintiff may wait on the sheriff, as long as the sheriff chooses to indulge the defendant; or the plaintiff may consent to reasonable adjournments from time to time, or even direct such adjournments, without thereby losing his priority, provided it is done in good faith.

Sixth. The plaintiff, when he delivers his execution to the sheriff, or at any time afterwards, may direct the sheriff not to proceed to a sale, without further orders from him; or unless urged on by younger executions, without *thereby* losing his priority: provided the same be done in good faith. But,

Seventh. If the defendant is permitted with the knowledge and consent of the plaintiff *express* or *implied*, not only to retain the possession of the property and to use and enjoy it for its ordinary and appropriate purposes, as in the case of household goods; but to exercise an unlimited control over all the property levied on, whatever may be its nature; to use, sell, exchange or consume it, as the rightful and absolute owner, it is such evidence of a fraudulent and colorable use of the process of the

court, whether the debt be a real and just one or not, as to post-
pone the execution to younger ones sued out and prosecuted in
good faith.    And lastly, it is not necessary to prove *actual fraud*
in the concoction of the judgment; nor *an actual deliberate in-
tention or design*, to defeat, hinder or delay other creditors.    A
man may lose his rights, as well by negligence, and a disregard
to the rights of others, as by positive fraud or malfeasance.

I propose then to test this case, upon the facts stated, by the
rules here laid down.

The first three executions were delivered to sheriff Woodruff
on the 15th May, 1834, and immediately levied on all the de-
fendant's property.    From that time, until the summer of 1841,
a period of seven years, the property was left in the possession
of the defendant, during all which time he was permitted with
the knowledge and consent of the plaintiffs, not only to use and
enjoy it, for its ordinary and appropriate purposes, consuming
and wearing it out, but in all respects acting as the absolute and
unqualified owner of the property, selling and otherwise dispos-
ing of it, as he thought proper.    A few days after the levy, the
plaintiffs met at the defendant's house, and there bargained with
him, at private sale, for a part of his property, consisting of a
share in a certain vessel, and by their own agreement, appro-
priated four hundred dollars, part of the consideration moneys,
towards the payment of the second in order of time of those
three executions: and it was then agreed among them, as sheriff
Woodruff expresses it in his affidavit, that " the executions were
to lie."

Nothing of course, was done by sheriff Woodruff, to take care
of or preserve the property.    In the winter of 1839 and 40,
nearly six years afterwards, Bevan one of the plaintiffs in the
first execution, told sheriff Woodruff, that he wished to get a set-
tlement with Hann; that he had paid some money, and some
work, and in the end the money would have to be made.    After-
wards, in February, 1840, Bevan handed sheriff Woodruff, a
statement of what he said was then due on that execution, and
told him, if other executions pushed, he must claim his right.
Soon after, on the 3d of March, 1840, Stull, one of the plain-
tiffs, gave sheriff Woodruff a written discharge for his half of

the amount due on the first execution, and nothing further was then done.

On the 24th of February, 1840, two other executions, one at the suit of Stull, and one at the suit of Flanagin, (who was sole plaintiff in the second of the three executions first mentioned, and one of the plaintiffs in the last of those executions,) were delivered to sheriff Davis, who had succeeded sheriff Woodruff. With these executions no special directions were given, and sheriff Davis, levied them upon the property then in Hann's possession, and left it with him.

In November following, Mr. Thompson, attorney for the plaintiff in the two last named executions, sent sheriff Davis writs of *venditioni exponas,* in those suits. Sheriff Davis immediately informed Hann of this. The latter thereupon procured from Mr. Thompson and handed to the sheriff a letter, dated the 19th November, 1840, saying: " The writs of *venditioni exponas,* I sent you, were *not* intended to require you to sell the property of Mr. Hann; they were merely sent as usual in such cases: and you will understand them as *matters of form merely:* nor can you be amerced at the coming court, nor shall I make any such motion. Your orders upon the executions must come from the plaintiffs, when they wish their money made."

In consequence of this letter, sheriff Davis did nothing, and matters so remained until the 4th of June, 1841, when the execution in favor of the Cumberland Bank was delivered to sheriff Davis, with instructions to proceed without delay. On the very next day, the sheriff received notices of amercement, and special instructions from Mr. Thompson, to proceed immediately on the two executions which had been issued by him.

Sheriff Davis being about to sell the property levied on by him, the former sheriff Woodruff, interposed and claimed a prior right under the first three executions, and insisted upon selling the goods himself. To obviate difficulties, it was arranged, that sheriff Davis should sell and bring the moneys into court, to be distributed under its direction.

From the facts above stated, and the affidavits which have been read, it appears not only that the three first executions, were suffered to lie dormant, for the unusual and extraordinary period of *seven years,* but that in the mean time, the defendant,

with the knowledge and consent of the plaintiffs, kept and used the property as his own, selling, changing, consuming and disposing of it, as he pleased; and that the plaintiffs bought a portion of it, of the defendant at private sale and applied a part of the proceeds to the second execution.

These facts bring the case directly within the principles adopted by this court in *Williamson* v. *Johnston*, *Matthews* v. *Warne* and *Cook* v. *Wood*, and also recognized by the court, in *Sterling* v. *Van Cleve*. The misuse of these three executions, was not so flagrant as in the cases just mentioned: but if an execution may be suffered to lie six or seven years in the sheriff's hands, and the defendant be permitted in the mean time to exercise uncontrolled dominion over the property, and yet retain its priority, purchasers would never be safe, nor tradesmen know whom to trust.

The legislature have had to interfere in the case of executions out of the courts for the trial of small causes, and limit the lien created by such process, to one year: and if we sustain such a use of the process of the Supreme Courts, as has been made of the first three executions in this case, the legislature must again interfere: or else creditors will never know, when they may invoke the aid of our courts, for the recovery of their rights with any prospect of success.

Then as to the next two executions, those issued by Mr. Thompson; although by the rules of the common law, they ought clearly to be postponed; yet upon the principles that have been recognized by our predecessors on this bench, in the cases I have referred to, I do not feel at liberty to do so. Not because I am restrained by force of the maxim *stare decisis:* for so it has not been expressly decided: but because those predecessors have said that the common law rule upon this subject was not recognized and acted upon in this state, at the time of the adoption of our constitution. Besides, in relation to these two executions, there was no interference on the part of the plaintiffs. The sheriff had no orders to stay proceedings; he was left to exercise his own discretion, and the executions were not suffered to lie, an unusual time.

The rules laid down in this opinion do not conflict with the decision of this court, in the case of *Cook* v. *Wood:* for although

the court in that case expressed itself in terms somewhat at variance with the rules here adopted, yet the facts of that case fully justified the decision there made upon the principles that governed the cases of *Williamson* v. *Johnston* and of *Matthews* v. *Warne.*

The result is, that in my opinion, the Circuit Court of Cumberland County, ought to be advised to set aside the order heretofore made in this matter, and instead thereof to order and direct that the moneys in court in this case, be applied, in the first place, to pay off and satisfy the fourth and fifth executions in the state of the case mentioned, in the order of their priority ; that the surplus, if any, be applied to the satisfaction of the execution in favor of the Cumberland Bank ; and that the residue, if any, be appropriated to the payment of the first three executions, in the order of their respective priorities ; and that it be further ordered, that the several parties pay their own costs, that have arisen on the argument of this case, in this court.

*The Circuit Court advised to render judgment accordingly.*

ELMER, J., while at the bar having been of counsel for the Bank in this case, gave no opinion.

CITED *in James* v. *Burnett, Spencer* 641 ; *Woodruff* v. *Chapin,* 3 *Zab.* 570; *Caldwell* v. *Fifield,* 4 *Zab.* 155–159.